# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11-40078-02-JAR** |
| | ) | |
| **MARCUS D. ROBERSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Defendant Marcus Roberson was convicted by a jury of: conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base (Count 1); conspiracy to distribute and possess with intent to distribute 5 kilograms of cocaine (Count 2); and willfully, deliberately, maliciously, with premeditation and malice aforethought, killed Crystal Fisher to prevent her from communicating to a law enforcement officer of the United States the facts and details of the commission and possible commission of federal offenses, namely distribution and conspiracy to distribute, cocaine and cocaine base (Count 3).[1]

The Court took under advisement Defendant Roberson's oral motions for judgment at the close of the government's case and at the close of trial. Roberson also filed a Motion for New Trial (Doc. 532) and Supplemental Motion for New Trial (Doc. 675). For the reasons discussed below, the Court denies Roberson's oral motions for judgment of acquittal, as well as his motion for new trial and supplemental motion for new trial.

---

[1]Verdict Form, Doc. 525.

I.      **Standards**

Defendant Roberson orally moved for judgment at the close of the government's

evidence and at the close of all evidence, pursuant to Fed. R. Crim. P. 29.  In deciding a Rule 29

motion, the court may not weigh the evidence or assess the credibility of the witnesses.[2]

"Rather, the Court must 'view the evidence in the light most favorable to the government and

then determine whether there is sufficient evidence from which a jury might properly find the

accused guilty beyond a reasonable doubt.'"[3]  A motion for acquittal at the close of the

government's evidence looks only to the evidence adduced during the government's presentation

of its case.[4]  "Acquittal is proper only if the evidence implicating defendant is nonexistent or is

'so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"[5]  Accordingly,

as long as the jury's inferences and conclusions are reasonable, the court will not disrupt the

verdict.[6]

Roberson also filed a motion and supplemental motion for new trial, pursuant to Fed. R.

Crim. P.  33(a) and (b)(2), again challenging the sufficiency of the evidence, challenging Jury

Instruction 16, and claiming he is entitled to a new trial because the government failed to

disclose exculpatory evidence about government witness Antonio Cooper.  Rule 33 states that

---

[2]*United States v. Parker*, 521 F. Supp. 2d 1174, 1176 (D. Kan. 2007).

[3]*Id.* (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982)).

[4]Fed. R. Crim. P. 29; *United States v. Delgado-Uribe*, 363 F.3d 1077, 1082 n.3 (10th Cir. 2004).

[5]*United States v. Parker,* 521 F. Supp. 2d, 1176 (quoting *White*, 673 F.2d at 301).

[6]*United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (citing *United States v. Rahserparian*, 231 F.3d 1257, 1262 (10th Cir. 2000)).

the court may grant a motion for a new trial "if the interest of justice so requires."[7]  A motion for

new trial under Rule 33 is not regarded with favor and is granted with great caution.[8]  The

decision whether to grant a motion for new trial is committed to the sound discretion of the trial

court.[9]  Motions for new trial based on insufficiency of evidence are granted only in exceptional

circumstances.[10]

## II.    Sufficiency of the Evidence

Roberson moves for judgment and new trial on the basis that there was not sufficient

evidence to prove his guilt beyond a reasonable doubt on each of the three counts of conviction.

As explained below, when viewed in the light most favorable to the government, there was

sufficient evidence from which a jury could properly find Roberson guilty of each charge beyond

a reasonable doubt.

### A.    There was sufficient evidence of drug conspiracies charged in Counts 1 and 2

In Count 1 of the First Superseding Indictment, Defendant Roberson was charged with

conspiring with Virok Webb, Jamaica Chism, Alisha Escobedo, Megan Fuller, Kennin

Dewberry, Caress Jackson, Keishana Johnson, and others, to distribute and possess with intent to

---

[7]Fed. R. Crim. P. 33(a).

[8]*United States v. Herrera,* 481 F.3d 1266, 1269-70 (10th Cir. 2007) (citing *United States v. Trujillo,* 136 F.3d 1388, 1394 (10th Cir.1998)).

[9]*United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998).

[10]*See. e.g. United States v. Cesareo-Ayala*, 576 F.3d 1120, 1125–27 (10th Cir.2009) (verdict not against weight of evidence when it was reasonable to infer from officer testimony and other evidence that defendant was involved in drug distribution); *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (verdict against weight of evidence because the testimony of the only witness who identified defendant, was impeached); *United States v. Huerta-Orozco*, 272 F.3d 561, 567 (8th Cir. 2001) (verdict against weight of evidence when government presented scant evidence that defendant knowingly participated in drug distribution).

distribute 280 grams or more of cocaine base from approximately November 7, 2008 to approximately April 1, 2011, in the District of Kansas and elsewhere.[11]  In Count 2 of the First Superseding Indictment, Defendant Roberson was charged with conspiring with these same individuals to distribute and possess with intent to distribute five kilograms or more of cocaine, during the same time period as Count 1.[12]

Roberson challenges the sufficiency of the evidence on the two conspiracy counts, for a number of reasons.  Roberson posits that the evidence proves that he was just "a small time drug dealer on even the best days, not the kingpin the government wished him to be."  Roberson points to the lack of evidence that he used aliases, and the lack of evidence that he engaged in wire transfers of money, or had money near or on his person.  To be sure, there was no evidence that Roberson engaged in financial transactions from which an inference could be drawn that he was transacting in large sums of money.  But there was evidence that Roberson had no apparent legitimate source of income.  In fact, Megan Fuller, who had a sexual relationship with Roberson in 2010, testified that Roberson was not employed and that his sole source of income was selling drugs.

Roberson also posits that there was no evidence that he was found in possession of drugs, drug packaging or paraphernalia, despite law enforcement executing a search warrant at his house.   But there was evidence that Roberson possessed crack cocaine packaged for sale.  In March of 2011, law enforcement officers attempted to stop Roberson, who led them on a car chase followed by a foot chase through a heavily wooded area.  Roberson was the sole occupant

---

[11]Doc. 50.

[12]*Id.*

of the car he was driving; and in the car, officers recovered drug packaging in the form of an empty container of disposable glass cleaner wipes.  There was crack cocaine residue in the container.  Officers used a drug dog that day to search the proximity of the area of Roberson's foot chase, but found nothing.  On the following day, however, they searched the same area again and found twenty-three grams of crack cocaine, lying next to a lid from a glass wipe container and a roll of glass wipe towels, that appeared to have come from the container with crack residue that had been found in Roberson's car.  A reasonable jury could conclude that it was Roberson's crack cocaine.  Despite the fact that there was a known crack house in that same area, a reasonable jury could have concluded that no one left twenty-three grams, or about $2200 of crack cocaine laying there, but that Roberson had discarded the crack cocaine as he fled from officers.

Roberson acknowledges the evidence that he sold crack cocaine on three occasions, in three controlled buys, but argues that these were small purchases by users, not drug dealers, and that the quantities of these transactions do not total fifty grams, as charged in Count 1, conspiracy to distribute crack cocaine.  To be sure, the three controlled purchases consisted of Roberson selling 1.16 grams of crack cocaine and 2.21 grams of crack cocaine on two occasions, to Claudette Ruble, a user; and Roberson selling 1.34 grams of crack cocaine to a confidential informant.  But there was abundant evidence that Roberson not only sold crack and powder cocaine to other users, he sold crack and powder cocaine to other drug dealers, some of whom supplied still other drug dealers.  Drug users Barbara Shaw and Michael Lillinbridge testified about purchasing "eightballs" of crack cocaine directly from Roberson.  Drug dealers Jermaine Jackson, Raschone Smith and Antonio Cooper testified about purchasing crack cocaine and

powder cocaine from Roberson. Jamaica Chism testified about selling or distributing crack and powder cocaine supplied by Roberson. Even Roberson's wife, Esther Roberson, (aka "Ria"), testified about delivering cocaine and collecting drug money for Roberson.

And, there was substantial evidence that Roberson was engaged in a conspiracy to distribute crack cocaine and a conspiracy to distribute powder cocaine as charged. Webb and Roberson ran a drug business; Webb was at the top, and Roberson was second in command. Both Webb and Roberson led, organized, supervised and managed the other conspirators. There was substantial evidence that Roberson, Webb and the other members of the conspiracy were interdependent, relying upon one another for various services critical to the success of the conspiratorial objectives. Many of the coconspirators testified: Jermaine Jackson, Raschon Smith, Antonio Cooper, Ria Roberson, Jamaica Chism, Megan Fuller, Alisha Escobedo, and Michael Lillinbridge. The testimony of each conspirator was largely corroborative of the testimony of the others, though the conspirators had different roles and some had relatively limited roles.

Based on the testimony of these witnesses, the evidence was that from about November 2008 through about April 1, 2011, Virok Webb orchestrated and directed the shipment of both powder and crack cocaine to he and Defendant Roberson in the Junction City and Manhattan, Kansas area. They had sources in Wichita and Kansas City, including Kennin Dewberry, who was previously convicted of being a member of the conspiracy.[13]

Webb and Roberson sold and supplied powder and/or crack cocaine to various

---

[13]This Court severed codefendant Kennin Dewberry's trial, and a jury convicted him of Counts 1 and 2, the conspiracy counts. The Tenth Circuit Court of Appeals affirmed Dewberry's conviction and sentence. *United States v. Dewberry*, —F.3d—, 2015 WL 3853576 (10th Cir. June 23, 2015).

individuals, including Antonio Cooper, Raschon Smith, Jermaine Jackson, Jamaica Chism and Crystal Fisher, who in turn sold or distributed powder and/or crack cocaine to other dealers and/or users.  Cooper testified that he purchased about 4.5 ounces of powder cocaine per week, and in turn he sold it to other dealers as well as users.   Jermaine Jackson testified that he, too, was supplied cocaine by either Webb or Roberson, typically in one to two ounce quantities, which Jackson in turn sold to both users and dealers.  Before 2011, Jackson was supplied powder by Webb and Roberson.  But from February to May 2011, only Roberson supplied Jackson with ounces of crack cocaine; and Jackson estimated that he purchased a minimum of two ounces of crack cocaine during this period.  Jackson further testified that Roberson supplied him with at least thirty-six ounces of powder or crack cocaine during the time Jackson was a member of the conspiracies.

Megan Fuller not only distributed crack cocaine, she cooked powder into crack cocaine. Ria Roberson, as well as Fuller, Alisha Escobedo and Jermaine Jackson testified that they observed Roberson cooking powder into crack cocaine on multiple occasions.  Escobedo delivered drugs for Webb and Roberson, at the direction of Jamaica Chism.  Escobedo testified that she saw Roberson three to five times a week, always for the purpose of transporting drugs to him or for him.  Coconspirators Caress Jackson, Keishana Jackson, and Jamaica Chism stored the organization's drugs at their residences, as well as collected money due from buyers.

Escobedo, Fuller and Lillinbridge also traveled to Kansas City pick up cocaine from Webb's supplier, Kennin Dewberry.  For a time, Webb had a crack cocaine supplier in Wichita; and Fuller, Escobedo, Lillinbridge, and/or  Jermaine Jackson traveled to Wichita on multiple occasions to pick up a supply of crack cocaine from that source.

In short, there was substantial evidence proving that Roberson was a member of the drug conspiracies, worked with Webb, and directed a number of people under him, for purposes of distributing significant quantities of powder and crack cocaine.  Although Roberson sold to some users, he also supplied to dealers who sold to users, as well as dealers who sold to other dealers. Many, indeed most, of the members of the conspiracy testified, largely corroborating one another.

Not surprisingly, Roberson challenges the credibility of these many coconspirators and witnesses.   But the Court must "resolve any possible conflicts in the evidence in favor of the government and assume that the jury found that evidence credible."[14]  Because issues of fact are within the exclusive province of the jury, the court should accept the jury's credibility determinations and its resolution and balancing of conflicting evidence.[15]  Indeed, a court will overturn the jury's determination of credibility and disregard a witness's testimony only if the testimony is inherently incredible, such as accounts of events that are impossible under the laws of nature, or accounts of events that were physically impossible for the witness to observe.[16] Roberson does not, and could not, reasonably suggest that these witnesses' recounting of what they observed was impossible "under the laws of nature," nor that any witness "physically could not have possibly observed" the events in issue.  Thus, the Court declines to overturn the jury's determination of credibility as well as the jury's verdict, and denies Roberson's motions for judgment and new trial on Counts 1 and 2.

---

[14]*United States v. Doddles*, 539 F.3d 1291, 1293–94 (10th Cir. 2008).

[15]*United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010).

[16]*Id*. (quoting *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001)).

**B.      There was sufficient evidence that Roberson committed the murder of Crystal Fisher**

Roberson also challenges the sufficiency of the evidence on Count 3, which charged him with willfully, deliberately, maliciously, with premeditation and malice aforethought, killing Crystal Fisher, on or about March 2, 2010 to March 3, 2010, to prevent her from communicating to a law enforcement officer of the United States the facts and details of the commission and possible commission of federal offenses, namely the distribution of cocaine and cocaine base and the conspiracy to distribute cocaine and cocaine based.   Roberson not only challenges the sufficiency of the evidence that he killed Fisher, as detailed in the discussion in Section III, *infra*, he also challenges the sufficiency of the evidence that Fisher was killed to prevent her from communicating to a law enforcement officer of the United States.

At approximately 12:05 a.m. on March 3, 2010, the Junction City police dispatcher received the first of several 911 calls, reporting that smoke was coming out of a parked vehicle with its engine revving.  Around 12:05 a.m., dispatch received another 911 call reporting that gunshots had been heard in that same area.  Police responded to the area, arriving at 713 W. 11th Street at 12:07 a.m.  There, police found a car parked in front of an apartment building.  Crystal Fisher was sitting inside the car in the driver's seat, her foot on the gas pedal, the engine revving.  She was dead, having suffered four gunshot wounds to her head and neck.  The shots, from a .40 caliber weapon, had been fired within two to three feet of the car, through the driver side window and door, as well as the passenger side and rear of the car.

Roberson's defense at trial was that Fisher had been shot by Antonio Cooper, not him.  Cooper was coconspirator who testified that he sold drugs supplied by Webb and Roberson, but

had no knowledge or involvement in the murder of Crystal Fisher.   In claiming that Cooper was the perpetrator, Roberson relied upon witness Taekiya Stanley, who testified that minutes after she heard gunshots that night, she saw a gold SUV speeding down the alley adjacent to the murder scene.  Cooper owned a gold Yukon SUV at that time; and he was driving the SUV that night when police stopped him at 2:45 am in Manhattan, Kansas, about twenty miles from the murder scene.

But a reasonable jury could have entirely discounted or discredited Stanley's testimony for several reasons.  First, Stanley admitted that she was smoking crack that night.  Secondly, there was evidence that no vehicle could have traveled at the rate of speed she described, given the configuration of the alley adjoining the site of the murder scene.  Thirdly, and most significantly, Phillip Long testified that he, too, heard the gunshots that night, and drove his gold Ford SUV to murder scene, about two blocks from his house.  Upon seeing Fisher slumped over the wheel of her car, the engine revving and smoking, Long called 911.

When viewed in the light most favorable to the government, the evidence of Antonio Cooper's involvement was minimal and weak.  Importantly, while the evidence supporting Roberson's conviction must be substantial, it "need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt."[17]  Moreover, as detailed below, there was substantial evidence from which a jury could find beyond a reasonable doubt, that Roberson killed Fisher.

First, there was strong circumstantial evidence, mostly in the form of the testimony of

---

[17]*United States v. Burkley*, 513 F.3d 1183, 1188–89 (10th Cir. 2008) (citation and quotation marks omitted).

witnesses who were in the company of Roberson in the hours before and after Fisher's murder, and who detailed Roberson's words and actions during those key hours.  Their testimony was substantiated by records of texts, phone "chirps"[18] and phone calls evidencing continual communications during those key hours, between Roberson, Webb, Chism and Ria Roberson,  as well as between Roberson and Fisher, the murder victim.[19]  Secondly, several witnesses testified to statements Roberson made to them before and after the murder, which a reasonable jury could have perceived as admissions that Roberson had killed Fisher.  Similarly, several witnesses testified to statements by Webb that implicated himself and Roberson in the murder.  Naturally, Roberson challenges the credibility of the testimony of these various witnesses.  But Roberson does not suggest that these witnesses' recounting of what they observed was impossible "under the laws of nature" nor that any witness "physically could not have possibly observed" the events in issue.[20]  Given that, this Court accepts their testimony in the light most favorable to the government and necessarily refrains from weighing their credibility.

Viewed in the light most favorable to the government, the testimony of these witnesses, and the evidence of phone, text and chirp communications between Roberson, Webb, Fisher and others, establish a compelling timeline of events during the day, evening and nighttime hours of March 2, 2010, and the early morning hours of March 3, 2010, after Fisher's murder around

---

[18]A chirp phone is essentially a mobile telecommunications technology, akin to a walkie-talkie service, that is offered by some communications providers.

[19]While the records of the texts provided the content of the communications, the records of the phone calls and chirps demonstrated that communications were made, but did not provide the contents of those phone and chirp calls.

[20]*United States v. Cardinas Garcia*, 596 F.3d 794 (10th Cir. 2010)(quoting *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001)).

midnight.  Around 4 p.m. on March 2, Junction City police officers went to the cosmetology school where Crystal Fisher was enrolled, and told her that they had purchased cocaine from her and wanted her to cooperate with them in the investigation of the Webb drug organization.  After the police left, a distraught Fisher called her friend, Crystal Brokenbough, and told her she was afraid of informing but also afraid of losing her child.  Fisher asked Brokenbough to accompany her to the police station the next day for her interview.  Fisher also told Webb about the police's visit with her, and their request that she cooperate with them.  Webb quickly shared this troubling information with Roberson and Chism.

Then, before nightfall on March 2, Webb, Roberson and Escobedo gathered at Chism's house.  Chism and Escobedo testified about the statements and actions of Roberson and Webb in the evening and night hours of March 2.  Webb arrived before Roberson, telling Chism that they needed to move all of the drugs that were stored at Chism's house, in case the police came to search.  Roberson arrived, dressed entirely in black, including a black hoodie and black gloves.  Roberson handed Chism a black gun with magazine, and directed Chism to clean the weapon for him.  Chism complied, leaving the gun in her bedroom after she cleaned it.  Before Webb departed, Webb directed Chism to have Escobedo pick up Roberson later that night.  Webb said he was going to Walmart so he could be "seen on the cameras."  Roberson asked Chism where the gun was and she told him; he apparently retrieved it, because it was no longer there after he departed.  Before he departed, Roberson told Chism that she and Escobedo should pick him up in the alley behind the low-income apartments on 13th Street in about fifteen to twenty minutes.  Roberson also mentioned that he was going to use a pay phone.

Phone records evidenced that Roberson and Webb had a series of communications with

12

Fisher in the hours before her murder that night.  At 6:32 p.m, Fisher texted Roberson about

meeting so she could pay him money she owed him.  From 8:56 p.m. to 9:02 p.m., there was a

six-minute phone call from Fisher to Webb.  From 10:07 to 10:40 p.m. there was a long string of

texts between Roberson and Fisher.  At 11:10 p.m., Fisher received a phone call from a pay

phone located at 1839 N. Washington, about twelve blocks from the murder scene.  Based on

Chism's testimony, a reasonable jury could find that Roberson placed this 11:10 p.m. call to

Fisher after he left Chism's house that night.  And, a reasonable jury could conclude that based

on the content of their texts that evening, Roberson and Fisher had agreed to meet late that night.

Indeed, the last text activity on Fisher's phone was at 11:45 p.m., when she texted Roberson,

"You there?"  About twenty minutes later, dispatch received the first 911 call concerning the

murder scene.

    Chism, who pled guilty to being an accessory after the fact to Fisher's murder, provided

key testimony about the timeline of events after the murder.  Escobedo testified to these events

as well.  After Roberson left Chism's house, Chism waited for a call telling her it was time to

pick up Roberson.  At 11:54 p.m., about eleven minutes before the first 911 call, Roberson called

Chism.  Thereafter, from 11:54 p.m. to 12:21 a.m., Roberson placed no outgoing calls, texts or

chirps from his phone.  Meanwhile, phone records reveal that from 12:06 to 12:15 a.m., there

were four phone calls between Webb and Chism, consistent with Chism's testimony that while

she waited at home, Webb called her repeatedly, asking her if she had heard anything from

Roberson.  These calls between Webb and Chism occurred at a key time, after the murder and at

the time, 12:07 a.m., that officers started arriving at the murder scene.  Then, at 12:21 a.m.

Roberson finally chirped Webb.  Thereafter, from 12:23 to 12:39 a.m., and again from 1:01 to

13

1:22 a.m. there were a series of calls between Chism, Webb and Roberson.

Chism testified that once she received the call to pick up Roberson, she and Escobedo rushed to pick him up. Escobedo drove her car, while Chism directed her where to drive. After a short, four minute drive, Chism directed Escobedo to drive very slowly down an alley between 13th and 14th streets, about two blocks from Chism's house. At that point, they spotted Roberson, who jumped in the back seat of Escobedo's car. Chism testified that as Roberson jumped into the car, he muttered "rat bitch" and ordered Escobedo to "go-go!" Roberson was nervous and out of breath. As he sat in the back seat, directing them where to drive, Roberson took off the black hoodie he was wearing and appeared to be wiping an object. Roberson tried to hand an object to Chism, ordering her to drop it in the lake for him; but Chism emphatically refused. Chism told Roberson to take Escobedo's car and do it himself.

So, Chism and Escobedo exited the car and walked back to Chism's house, where they listened to a police scanner, at Webb's direction. Meanwhile, Roberson left, driving Escobedo's car. Ria Roberson testified that Roberson called her and directed her to pick him up immediately from a certain location. This call likely occurred on or after 1:27 a.m., for there were no phone communications between Roberson and his wife between 11:56 p.m. when she texted him, and 1:27 a.m. when Roberson called her. Ria Roberson testified that she followed Roberson's directions, and drove to a location where he was parked in Escobedo's car. Ria Roberson testified that her husband was "antsy," "stressed out," and wearing dark clothing. At Roberson's direction, Ria Roberson followed Roberson as he drove Escobedo's car in a circuitous route for about ten minutes, before Roberson parked Escobedo's car and joined Ria Roberson in her car. Roberson then directed her to drive to Walmart. As she drove, Roberson disrobed, threw his

14

clothing out of the car window, and put on new clothing.  When they arrived at Walmart, they observed Webb leaving Walmart.  Ria Roberson was surprised that Roberson and Webb did not speak as they walked right past each other.  Roberson and Ria Roberson then shopped in Walmart for at least thirty minutes before going home.  Ria Roberson testified that Roberson's heart was racing, and that he was restless and unable to sleep the rest of that night.

In addition to this timeline of events, there was circumstantial evidence connecting Webb and  Roberson to the murder weapon, a .40 caliber gun.  Antonio Cooper testified that he and Webb had been friends and confidants since 1997, as well as Cooper's drug supplier.  About a week before the murder, Webb asked Cooper to obtain a gun for him so that Webb could pistol whip Jermaine Mosley over a drug debt.  Cooper obliged, obtaining a .40 caliber Glock from Tony Waldo, who had in turn obtained the gun from a man called "Be-lo."  Cooper delivered this gun to Webb at Webb's drug stash house.   When Cooper delivered the gun to Webb, Roberson was present, and Cooper observed another gun there, an AR-15 assault rifle.

Cooper further testified that after the murder, Webb told him that Webb had asked Roberson for the gun.  Webb said that he  planned to use the gun to murder the owner of the gun, staging it to look like a suicide, so that police would believe the owner of the gun had killed Fisher.   But Roberson told Webb that he had disposed of the gun.  In fact, a .40 caliber Glock was recovered from a pond behind the Walmart where Roberson and his wife shopped within hours after the murder.  Cooper testified that the recovered gun looked like the gun he provided to Webb; and Chism testified that the recovered gun looked like the gun that Roberson had her clean shortly before the murder, on the night of March 2.

Moreover, on March 3, in the immediate hours after the murder, Webb made a number of

statements further implicating himself and Roberson in the murder.  On March 3, Webb told

Chism that if anyone asked, she was to say that Webb had come to her house on the night of

March 2 only to pick up clothes for their daughter.  Also, on March 3, Webb posted on his

MySpace page  "Be careful who u trust."  And, on March 3, Webb told Cooper that Roberson

had killed Fisher that night because the police had gone to Fisher's school and tried to talk to

her.  Webb also told Cooper that Webb had been at a Walmart that night in order "to get on the

camera," and that Escobedo and Chism drove to the crime scene.  Webb's statements to Cooper

were corroborated by the testimony of Escobedo, Chism and/or Ria Roberson.

In addition to this compelling timeline of events and the admissions and statements Webb

and Roberson made during the critical hours of March 2 and 3, there was evidence that Webb

and Roberson continued to make other inculpatory statements and admissions after March 3,

2010.  For example, Roberson asked Raschon Smith if Smith wanted to join Webb and

Roberson's organization and "get rid of rats around here."  And Webb told Raschon Smith that

Fisher's murder was some of his "work," done after he learned that Fisher had spoken with

police and that Fisher was going to inform on them.  Raschon Smith further testified that in

August 2011, Roberson admitted to him that he had murdered Fisher in her car, and tossed the

gun he used into the lake.

Jermaine Jackson testified that after the murder, he had conversations with Webb and

Roberson about their knowledge that Fisher had talked to the police.  Jackson further testified

that Webb made a comment about an assault rifle, saying "this is what happens to people who

run their mouth," and that Jackson believed Webb was referring to Webb's involvement in

Fisher's murder.  Antonio Cooper also testified that Roberson admitted to him that Roberson had

killed Fisher while she was sitting in her car, and also admitted that he had directed Webb to go to Walmart that night so that Webb would not get into trouble.

Barbara Shaw, who regularly bought cocaine from Roberson, testified that sometime after Fisher's murder, she texted Roberson to obtain cocaine. When he did not respond, Shaw texted "death before dishonor." This prompted Roberson to call Shaw, demanding to come to her house; and when he arrived, Roberson asked Shaw what she meant by that text. Shaw testified that she then had to convince Roberson that she was not working for the police. Roberson said "Look what I did to Crystal." When Shaw pressed him about this statement, Roberson said "Look what happened to her." Shaw testified that she thought in making this statement, Roberson had "slipped up."

In short, there was substantial evidence from which a reasonable jury could conclude that Roberson willfully, deliberately, maliciously, with premeditation and malice aforethought, killed Crystal Fisher on the night of March 2-3, 2010.

**III.    Count 3- Jury Instruction 16 and sufficiency of evidence that Roberson killed Fisher to prevent communication with federal law enforcement**

Roberson also challenges the sufficiency of the evidence on Count 3, arguing that the government fatally failed to prove that Fisher was killed with the intent to prevent her from communicating with federal law enforcement specifically, rather than law enforcement generally. This argument is tied to Roberson's argument that Jury Instruction 16, which set forth the elements of 18 U.S.C. § 1512(a)(1)(C), was erroneously worded.[21]

---

[21]Instruction No. 16, Doc. 524 at 20.

Instruction 16 necessarily included the language of the statute itself, which states that "Whoever kills or attempts to kill another person, with intent to—prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . ," violates the statute.[22] Roberson does not object to this language in Instruction 16.

But Roberson objects to the Instruction's wording of the fifth element of the offense,

> the defendant killed Crystal K. Fisher with the intent to prevent her from communicating with law enforcement officers about the commission or possible commission of federal offenses, namely, the distribution of cocaine and cocaine base, commonly known as 'powder cocaine' and 'crack cocaine,' respectively, and conspiracy to distribute cocaine and cocaine base."[23]

Roberson argues that the fifth element should have read "with the intent to prevent her from communicating with *federal* law enforcement officers."

This issue was settled by the Supreme Court in *Fowler v. United States*.[24]   In *Fowler*, a local police officer encountered Fowler and others while they were preparing a rob a bank. Fowler responded by shooting and killing the officer.  Fowler also argued that the evidence was insufficient to show that he had killed the local officer intending to prevent the local officer from communicating with a federal law enforcement officer.  But the Supreme Court held that the government need not prove that the defendant intended to prevent communication with federal officers specifically; it was enough to prove a "reasonable likelihood that a relevant

---

[22]18 U.S.C. § 1512(a)(1)(C). The First Superseding Indictment also tracks this statutory language.

[23]Doc. 524 at 20.

[24]131 S.Ct. 2045, 2048 (2011).

communication would have been made to a federal officer."[25]

Here, when viewed in the light most favorable to the government, there was sufficient evidence proving that it was reasonably likely that federal law enforcement would have joined the Junction City Police Department's  investigation of the Webb drug organization, such that killing Fisher likely precluded her from communicating not only with Junction City police officers, but with federal law enforcement officers as well.  Although it was local Junction City police officers who approached Fisher on March 2, 2010 to gain her cooperation, it was reasonably likely that the DEA would have subsequently joined the investigation, and communicated with Fisher about her knowledge and experience with the Webb drug organization.

Indeed, the DEA *did* join this investigation, albeit a few months after Fisher's murder. The joint investigation of the DEA and Junction City Police Department culminated in the filing of the drug conspiracy charges and the murder charge in this Court.  And, this was consistent with the practices of the DEA and the Junction City Police Department, in investigating large, wide-ranging drug organizations.  DEA Special Agent John Shannon, and Junction City Police Lt. Mike Lee both testified that their agencies routinely conduct joint investigations of drug organizations the size and scope of the Webb drug organization, which was the largest cocaine organization in the Junction City area at that time.  In fact, the DEA and Junction City Police Department jointly investigated the largest drug organization that preceded the Webb organization in Junction City, as well as the largest drug organization that succeeded the Webb organization in Junction City.  Those two investigations resulted in drug conspiracy charges

---

[25]*Id.*

prosecuted in this Court.

Lt. Lee testified that his police department typically begins investigations of large drug organizations by turning low-level street dealers into informants, and using them to make small purchases from the targets of the investigations.  Once there are some actual drug sales, the police department asks the federal law enforcement agencies to participate.  Special Agent Shannon agreed, testifying that once a police department has informants and purchases drugs from within an organization, the DEA begins participating to expand the investigation.[26] Shannon and Lee also agreed that they preferred having an informant from within the drug organization, such as Fisher, who was considered the third-ranking member of the organization, after Webb and Roberson.  Both the DEA and the Junction City Police Department would have wanted to interview Fisher and direct her in gathering evidence on the Webb organization.   This was sufficient evidence that it was reasonably likely that Fisher would have made a relevant communication to a federal law enforcement officer.

Irrespective of the Supreme Court's holding in *Fowler*, Roberson maintains that Instruction 16 impermissibly lowered the government's burden of proof, by not requiring proof that he acted with the intent to prevent Fisher from communicating with federal law enforcement, rather than law enforcement generally.  In addition to setting forth the statutory language, and the elements of the offense, including the fifth element, quoted above, Instruction 16 states:

Additionally you must find that the government has proved a

---

[26]*See United States v. Smith*, No. JFM-11-953, 2012 WL 1145864 at *6 (D. Md. Apr. 2, 2012) (setting out several non-exclusive factors considered by DEA in determining whether to investigate, including: scale of organization, structure of organization, propensity for violence and criminal history of the parties involved).

reasonable likelihood that had Crystal K. Fisher communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer. That is to say, if you find that the defendant killed Crystal K. Fisher with the intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communication with *federal* law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer.

To that end, the Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical.

The government is not required to prove that Crystal K. Fisher intended to communicate with a federal law enforcement officer.[27]

In all respects, Instruction 16 was true to the Supreme Court's construction of the elements and meaning of terms in 18 U.S.C. § 1512(a)(1)(C). First, the Supreme Court made clear that the government is not required to prove that the defendant acted with federal law enforcement in mind, explaining,

We cannot determine whether the individual the defendant had in mind is in fact a federal officer, because the defendant did not have a particular individual in mind. And we cannot insist that the defendant have had some general thought about federal officers in mind because the statute says that 'no state of mind need be proved' in respect to the federal nature of the communication's recipient.[28]

To require that the defendant had some particular, identifiable law enforcement officer in mind,

---

[27]Doc. 524 at 21.

[28]*Fowler*, 131 S. Ct. at 2050.

would thwart the statute's purpose to criminalize witness tampering.[29]  For witness tampering may be more serious and more effective when accomplished before the victim has engaged in any communication with law enforcement.[30]

Nonetheless, the government must prove a reasonable likelihood of a hypothetical communication with a federal law enforcement officer.[31]  Yet, the government "need not show beyond a reasonable doubt (or even that it is *more likely than not*) that the hypothetical communication would have been to a federal officer.[32]  On the other hand, the government must show something in addition to the broad, indefinite intent to prevent communications with law enforcement officers in general.[33]  Otherwise, the scope of this statute would include many instances of witness tampering in purely state investigations.[34]  The Supreme Court acknowledged that some acts violate both state and federal law, and that where a federal crime is at issue, there is always a possibility of communication with federal officials.[35]  Thus, the Supreme Court rejected a mere " possibility" standard, as not true to the federal-state balance of prosecutions.[36]

---

[29]*Id.* at 2049.

[30]*Id.*

[31]*Id.* at 2050.

[32]*Id.*

[33]*Id.* at 2051.

[34]*Id.*

[35]*Id.*

[36]*Id.* at 2052.

Moreover, the relevant question is the defendant's intent,[37] and it is possible for someone to intend to prevent a communication, "even if there is some considerable doubt that any such communication would otherwise have taken place."[38]  Thus, Roberson's argument that the investigation was not federal at the time of Fisher's death is inapposite, as the government

> need not show that such a communication, had it occurred, would
> have been federal beyond a reasonable doubt, nor even that it is
> more likely than not . . . one can act with an intent to prevent an
> event from occurring without it being true beyond a reasonable
> doubt (or even more likely than not) that the event would
> otherwise occur.[39]

And, any argument that there is no evidence Fisher would have communicated with federal law enforcement is likewise inapposite.  For this statute contemplates the intent of defendant, not the victim.[40]  Determining the potential witness's unequivocal or likely intent to communicate would not only pose a challenge, but it would also undercut the purpose of the statute by encouraging, rather than deterring, the rapid killing or attempted killing of a potential witness.  Thus, the Fourth Circuit affirmed a conviction under § 1512(a)(1)(C) even when the victim showed no intent to communicate with federal officers.[41]

For all of these reasons, the Court concludes that Roberson's motions for judgment and for new trial on Count 3, challenging Jury Instruction 16 and the sufficiency of the evidence, are

---

[37]*Id.* at 2050.

[38]*Id.*

[39]*Id.* at 2052.

[40]*Id.*

[41]*See United States v. Ramos-Cruz*, 667 F.3d 487, 498 (4th Cir. 2012) (noting that, applying the *Fowler* standard, prosecution under § 1512(a)(1)(C) still reaches killings that occur before the victim communicates with law enforcement officers).

without merit.

## IV.     Count 3- Government's non-disclosure of information about Antonio Cooper

In his Supplemental Motion for New Trial,  Roberson contends that newly-discovered

evidence reveals that the government failed its obligation to disclose exculpatory information

about witness Antonio Cooper, in violation of *Brady v. Maryland*,[42] and *Giglio v. United States*.[43]

Roberson was convicted by a jury on March 6, 2014, and filed this supplemental motion for new

trial on January 29, 2015, long after the fourteen-day deadline established by Fed. R. Crim. P.

33(b)(2).   Roberson claims the supplemental motion is nonetheless timely under the three-year

deadline of Fed. R. Crim. P. 33(b)(1), because it is based on newly-discovered evidence.

Roberson's supplemental motion appears to seek a new trial only on Count 3, the murder

conviction, arguing that the newly-discovered evidence is impeachment evidence relating to

Antonio Cooper's involvement in a previous homicide.

As the government notes, Roberson fails to detail when and how he discovered or

received this new evidence, other than to say he discovered it after the trial.  It is unclear how he

became aware of the information, but as the government posits, there is no due process

infringement if Roberson knew about this evidence before trial, regardless of the  failure to

disclose.[44]  Nonetheless, for purposes of this motion the Court assumes that this is in fact newly-

discovered evidence.

Roberson offers that he discovered evidence that government witness Antonio Cooper

---

[42]373 U.S. 83 (1963).

[43]405 U.S. 150 (1972).

[44]*United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).

was involved in a homicide investigation in Manhattan, Kansas in 2001.  Highly summarized,

Anthony Mitchell and Jeremy Ware traveled to Manhattan to conduct a drug deal with Wesley

Alexander, which soon went awry.  An altercation ensued with Alexander's friends, and after

someone struck Mitchell in the back with a board, Mitchell began firing a gun indiscriminately.

In this manner, Mitchell shot and killed Shaun Leach, an unfortunate passenger in a nearby

vehicle whose occupants were involved in the altercation.   During the homicide investigation,

police interviewed Antonio Cooper, who admittedly was present and an eyewitness to the

shooting.  Several other witnesses had told police that Cooper supplied the gun to Mitchell

during the altercation.  But Mitchell identified his friend, Jeremy Ware, as the person who

supplied him with the gun, during the altercation.[45]  Mitchell was prosecuted by the State of

Kansas, and pled no contest to second degree murder.

     Jeremy Ware and the victim, Shaun Leach, were both servicemen stationed at Fort Riley,

Kansas.  Ware was court martialed for his part in Leach's homicide.  The court's findings in the

Ware court-martial proceeding are not materially inconsistent with Mitchell's statement that

Ware had supplied him with the gun.  The courts martial judge found that

> During the early morning hours of 21 January 2001, in the parking
> lot of a bar in Manhattan, Kansas, appellant witnessed an
> altercation between a civilian, Anthony Mitchell, and a soldier,
> Private (PVT) Craig Newsome, and a group of PVT Newsome's
> friends. An acquaintance of appellant's, Antonio Cooper, was also
> in the parking lot observing the fight. Appellant looked on as PVT
> Newsome and his group of friends became aggressive and hostile
> and formed a "U-shape" around Mr. Mitchell. The tension of the
> situation increased when PVT Newsome hit Mr. Mitchell in the

---

[45]These facts are laid out in greater detail in the Kansas Court of Appeals decision on Mitchell's habeas petition, *Mitchell v. State*, 111 P.3d 198 (unpublished table decision), 2005 WL 1136872, at *1 (Kan. Ct. App. May 13, 2005).

back with a board. Angered by the attack on Mr. Mitchell, appellant went to the trunk of his car and retrieved a loaded handgun. He tucked the gun inside his pants, pulled his shirt over it, and "walked over to where Antonio Cooper was standing." At this point, the fight started to break up and PVT Newsome's group had left the scene and were walking to their vehicles. But appellant was still angry so he removed his gun and handed it to Mr. Cooper "intending that [Cooper], himself, would resolve the situation by retaliating against the group because of their actions," or that Mr. Cooper would pass the weapon to Mr. Mitchell who could get even with PVT Newsome. When Mr. Cooper received the gun, he handed it to Mr. Mitchell who went after PVT Newsome's group as they tried to drive out of the parking lot. Mr. Mitchell then "fired off shots in retaliation for them attacking him."[46]

Ware was charged and pled guilty under the military code of justice, to attempted unpremeditated murder, violation of a lawful general regulation carrying a concealed weapon and wrongful acquisition of a firearm.  Police did not file charges against Antonio Cooper.

Roberson argues that the government should have disclosed Cooper's involvement in this incident so that Roberson's defense team could have investigated further, and used the information to impeach Cooper, by showing that Cooper had previously lied about his role in the Shaun Leach homicide.  *Brady* and its progeny require the government to disclose both exculpatory evidence and evidence that possibly could be used to impeach a government witness, whether or not requested by the defendant.[47]  In order to establish a *Brady* violation, the defendant must demonstrate: (1) the prosecution suppressed evidence; (2) the evidence was

---

[46]*United States v. Ware*, No. Army 20010923, 2005 WL 6524258, at *1 (A. Ct. Crim. App. Mar. 10, 2005).

[47]*Erickson*, 561 F.3d at 1162 (citing *Brady v. Maryland*, 373 U.S. at 87) (government is required to disclose evidence favorable to an accused where the evidence is material to either guilt or punishment); *United States v. Agurs*, 427 U.S. 97, 107 (1976)(disclosure is required even when the defendant has no requested the withheld material or has made only a general request); and *United States v. Bagley*, 473 U.S. 667, 676 (1985)(the disclosure obligation includes impeachment as well as exculpatory evidence)).

favorable to the defendant; and (3) the evidence was material.[48]

As a threshold matter, Roberson must demonstrate that the prosecution was actually in possession of the favorable evidence, or that one of the prosecution's agents was in possession of it.[49]  To be sure, Riley County law enforcement officials, who prosecuted Mitchell, and U.S. Army law enforcement officials, who prosecuted Ware, possessed information about these cases.  But the government states that it was not unaware of the Mitchell or Ware homicide cases until Roberson discovered this information, and thus the government neither possessed, controlled nor was aware of the information about Cooper.  Indeed, there is no indication in Roberson's motion that either the prosecution or its agents were aware of the information, much less in possession of it.

And, to the extent Roberson argues that the government should or could have learned of this information, this Court rejects that argument.  First, as the Tenth Circuit noted in *United States v. Hoyle*,[50] an argument that the government could or should have known about a witness's prior municipal court conviction, "highlights that this evidence was not in the 'possession or control of the government' as *Brady* requires, and the fact that there was no allegation that the "government kept itself intentionally ignorant" of the witness's prior conviction, shows that the prosecution did not suppress the evidence.[51]

Secondly, here the information the government did not possess or have knowledge about

---

[48]*United States v. Diaz*, 679 F.3d 1183, 1192 (10th Cir. 2012).

[49]*Erickson*, 561 F.3d at 1163 (citing *United States v. Velarde,* 485 F.3d 553, 559 (10th Cir.2007)).

[50]751 F.3d 1167, 1171–72 (10th Cir. 2014)

[51]*Id.*

was more tenuous than a prior municipal court conviction.  Antonio Cooper was an eyewitness to a murder, never charged with any crime, and was merely mentioned in the two reported, but unpublished decisions concerning the state court conviction of Anthony Mitchell and the courts martial of Jeremy Ware for their participation in the murder.[52]  This Court declines to find that the government has any duty to discover the mere mention of a witness's name in a decision concerning the prosecution of someone for an unrelated homicide more than ten years before the case at hand.  Roberson fails to show the first prong of a *Brady* violation, that the prosecutor suppressed the evidence.

Nor does Roberson convincingly show that the evidence was favorable to him or material, as *Brady* requires.  For under *Brady*, information is not material unless there is a reasonable probability that the result of the proceeding would have been different, that is, a "likelihood of a different result is great enough to undermine confidence in the outcome."[53]  Conversely, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."[54]

This Court finds implausible any argument that the information about Cooper was exculpatory with respect to the murder charge against Roberson.[55]  First, given that Cooper was

---

[52]*See United States v. Ware*, No. Army 20010923, 2005 WL 6524258, at *1 (A. Ct. Crim. App. Mar. 10, 2005); *Mitchell v. State*, 111 P.3d 198 (unpublished table decision), 2005 WL 1136872, at *1 (Kan. Ct. App. May 13, 2005).

[53]*Smith v. Cain*, 132 S.Ct. 627, 630 (2012).

[54]*United States v. Agurs*, 427 U.S. 97, 109–110 (1976).

[55]Roberson's Supplemental Motion for New Trial only addresses the effect of this newly-discovered evidence on the murder charge in Count 3, not on the drug charges in Counts 1 and 2.

neither convicted nor even charged for any role in the 2001 homicide, it is highly unlikely that this evidence would have been admissible in Roberson's trial under Rule 404(b),[56] as it would not be probative of intent, nor any of the other bases for admissibility of prior acts.  Nor would the evidence be admissible to prove bad character.

Secondly, even if Roberson were able to admit this evidence, it is highly unlikely it would have led to a different outcome in the trial.  Roberson's defense was that Cooper killed Fisher.  But the evidence was weak; the testimony of a crack-addled witness who thought she saw a gold SUV speeding away from the murder scene, and Cooper being stopped in his gold SUV, twenty miles away and three hours after the murder.  A reasonable jury could discredit that testimony in favor of the testimony of Philip Long, who testified that he heard the gunshots, and drove his gold SUV to the murder scene in short succession, as well as called 911.  In short,  as outlined in a preceding section of this opinion, there was more than sufficient evidence that Roberson killed Fisher.

Roberson posits that he could have used this information to impeach Cooper's testimony, by showing that Cooper lied to police in 2001 when he denied supplying the gun to Mitchell.  Again, there are admissibility problems.  If Roberson had cross-examined Cooper about the alleged lie he told police in 2001, and Cooper maintained that he did not lie, it is unlikely that Roberson could have gone further in this line of impeachment.  For Rule 608 of the Federal Rules of Evidence does not permit introduction of evidence regarding collateral matters solely for the purpose of impeaching the credibility of a witness, in that it prohibits proving by extrinsic

---

[56]Fed. R. Evid. 404(b).

evidence, a specific instance of the conduct of a witness.[57]

Moreover, with respect to evidence that impeaches a witness, it "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."[58]  For the reasons outlined above, even if Cooper had been thoroughly impeached with this additional information, the other evidence concerning Roberson's involvement in the murder was strong enough to sustain confidence in the verdict.  While Cooper testified that he gave the murder weapon to Webb and that Webb later told him that Roberson had disposed of the gun, other witnesses provided evidence that placed the gun in Roberson's hands in the hours before and after the murder.  Jamaica Chism cleaned the gun for him.  Chism and Escobedo testified that Chism refused to throw "something" in the lake for Roberson; and a gun was recovered from the pond behind the Walmart that Roberson visited within a few hours after the murder.  Cooper testified that the recovered gun looked like the gun he provided to Webb.  But even discounting that testimony, Chism testified that the recovered gun looked like the gun she cleaned for Roberson that night.   In short, to the extent this evidence would have impeached Cooper's testimony, it was not material, as the other evidence of Roberson's guilt was strong enough to sustain confidence in the jury's verdict.

## V.      Conclusion

For all of the foregoing reasons, the Court finds that Defendant Roberson's oral motions for judgment of acquittal and his motion and supplemental motion for new trial should be

[57]*United States v. Velarde*, 485 F.3d 553, 561 (10th Cir. 2007).

[58]*Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (citing *United States v. Agurs*, 427 U.S. 97, 112-113, and n. 21 (1976)).

denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's oral motions for judgment of acquittal at the close of the government's evidence and at the close of trial are DENIED.

**IT IS FURTHER ORDERED** that Defendant's Motion for New Trial (Doc. 532) and Defendant's Supplemental Motion for New Trial (Doc. 675) are DENIED.

**IT IS SO ORDERED.**

Dated: July 14, 2015

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE