FILED
United States Court of Appeals
Tenth Circuit

November 16, 2016

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

─────────────────────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MARCUS D. ROBERSON,

    Defendant - Appellant.

No. 15-3305
(D.C. No. 5:11-CR-40078-JAR-2)
(D. Kan.)

─────────────────────────────

ORDER AND JUDGMENT[*]

─────────────────────────────

Before **LUCERO**, **HOLMES**, and **MORITZ**, Circuit Judges.

─────────────────────────────

Marcus D. Roberson appeals his convictions and life sentence for conspiracy to distribute 280 grams or more of crack cocaine (Count I), conspiracy to distribute five kilograms or more of powder cocaine (Count II), and murder to prevent a person from providing information to a law enforcement officer (Count III). Roberson argues that (1) the jury instruction on the murder count failed to specify that he intended to prevent a communication with a *federal* law enforcement officer; (2) the prosecution failed to disclose one of its witness's involvement in a prior shooting; (3) there was insufficient

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

evidence to support the jury's verdicts; and (4) the finality of his prior drug convictions was not determined by the jury. Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Virok Webb ran a "well-structured" drug distribution organization in Junction City, Kansas. R., Vol. I at 886. Its members included Webb; Roberson; Antonio Cooper; Jamaica Chism; Alisha Escobedo; Crystal Fisher; Jermaine Jackson; and others.

Law enforcement officers considered Roberson to be "second in charge." *Id.* at 1193. Roberson had several roles. In addition to selling cocaine, he would sometimes convert the organization's powder cocaine into crack cocaine. He would then give it to others, such as Jackson, to sell. Jackson testified that during the period of May 2009 to February 2011, Roberson supplied him with thirty-six ounces of crack cocaine. Roberson would also occasionally direct another member to pick up powder cocaine from a supplier in Wichita, Kansas, and bring it directly to him.

Cooper began distributing drugs for the organization in the summer of 2009. He testified that during a seven-month period in 2010, he obtained on a weekly basis roughly "2¼ to 4½ ounces," *id.* at 1300, of crack and powder cocaine from Webb to sell, *id.* at 1298, and that Roberson was present when Webb was handing it out, *id.* at 1299.

Chism had children with both Webb and Roberson. She testified that the organization distributed crack and powder cocaine on a daily basis and that she regularly interacted with the organization's members to further their distribution activities.

2

Escobedo's primary role in the organization was as a driver for Webb, Roberson, and Chism. She testified that "three to five times a week," she would meet with Roberson to transport drugs. *Id.* at 1429.

Fisher was "the number three person in [Webb's] organization." *Id.* at 1715-16. She sold drugs and would travel to Wichita to "pick up larger amounts of cocaine." *Id.* at 913. On March 2, 2010, police met with Fisher to recruit her as a confidential informant. Webb evidently learned of that meeting.

Toward the evening, Webb got together with Roberson, Chism, and Escobedo to discuss "the[ ] need[ ] to move the drugs . . . because . . . [Fisher] was an informant." *Id.* at 1434. Roberson handed Chism a gun and told her to clean it. Afterward, Roberson asked Chism if Webb had told her what he (Roberson) "ha[d] to do?" *Id.* at 1494-95. After she said "[n]o," *id.* at 1495, Roberson "said that he needed [her] and [Escobedo] to come pick him up" from an alley, *id.* at 1499, in fifteen or twenty minutes, *id.* at 1500.

Chism and Escobedo drove to the alley around midnight, looking for Roberson. He ran up to the car, and got into the back seat. "[O]ut of breath" and nervous, he exclaimed, "Rat bitch," and he directed them to "Go, go, get me out of here." *Id.* at 1505. As Escobedo was driving, she could see Roberson "wiping something . . . with the edge of his sweater." *Id.* at 1450. When they pulled over, Roberson tried to hand the object to Chism, telling her to "drop [it] off in the lake," she refused and then exited the vehicle with Escobedo and walked home. *Id.* at 1451.

Not far from where Chism and Escobedo picked up Roberson, police found Fisher shot to death in her car. Shell casings from the scene were consistent with a .40 caliber handgun.

Meanwhile, Roberson's wife drove to his location and picked him up. They headed to a Wal-Mart store. Along the way, Roberson began "[t]o throw clothes out the window" and change into clothes brought by his wife. *Id.* at 1593-94. After they parked at the store, as they were entering, they walked "right by" Webb, *id.* at 1596, who had gone to the store to "be seen on the cameras," *id.* at 1498. Roberson and his wife bought several items and returned home.

On the night of Fisher's murder, Cooper spoke with Webb. "[Webb] told [him] that [Fisher] was killed that night and that [Roberson] killed her." *Id.* at 1306. Several days later, Cooper spoke with Roberson, who admitted "he had killed [Fisher]" and "he had [Webb] go to Wal-Mart [to be seen on the security cameras] because . . . he didn't want nothing to happen to [Webb]." *Id.* at 1313.

Raschon Smith was Roberson's friend and one of Webb's former customers. Smith encountered Webb one evening at a local bar in the fall of 2010. While attempting to recruit Smith into the organization, Webb said that he was working with Roberson and that "what happened to [Fisher] . . . was some of their work," *id.* at 1673. Roberson later spoke with Smith, asking him to "get on the team so we could get rid of some of these rats around here." *Id.* at 1675. Roberson further told him that he had "put some work in on [Fisher] and that . . . he had to do that for the team," meaning "[k]illing her." *Id.* at 1675-76. Roberson explained he was concerned she might "bring the organization or the

4

team down." *Id.* at 1678.  Roberson also admitted throwing the murder weapon "in the lake." *Id.* at 1677.

Barbara Shaw frequently bought crack cocaine from Roberson.  Once, when Roberson suspected she might be cooperating with police, he warned her: "Look what I did to [Fisher]" and "Look what happened to her." *Id.* at 1641.

In October 2011, Webb, Roberson, and other members of the organization were indicted on drug-conspiracy and murder charges.  Roberson was convicted as charged and the jury found by special verdict that he had conspired to distribute 280 grams or more of crack cocaine and 5 kilograms or more of powder cocaine.

Roberson moved for a new trial, arguing insufficiency of the evidence and challenging the jury instruction for murder to prevent a person from providing information to a law enforcement officer.  He later supplemented the motion to raise the government's failure to disclose Cooper's involvement in a 2001 shooting.  The district court denied the motion.

At sentencing, Roberson sought to avoid mandatory life sentences on counts one and two on the basis that the finality of two prior drug convictions was not submitted to the jury and proven beyond a reasonable doubt.  The district court rejected the argument and imposed three concurrent life sentences.

Roberson now appeals.

5

## DISCUSSION

### I. Jury Instruction for Murder

Roberson challenges the jury instruction for murder to prevent communication with a law enforcement officer. That instruction is based on the federal witness tampering statute, 18 U.S.C. § 1512(a)(1)(C). The statute criminalizes "kill[ing] another person, with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense." *Id.*

The trial court's § 1512(a)(1)(C) instruction required the jury to find that Roberson killed Fisher "with the intent to prevent her from communicating with law enforcement officers about the commission or possible commission of federal offenses, namely, the distribution of cocaine and cocaine base . . . and conspiracy to distribute" those substances. R., Vol. I at 181. Roberson argues the instruction is deficient because it failed to describe "law enforcement officers" as "*federal* law enforcement officers." According to Roberson, omission of the word "federal" left "open the probability that the jury would convict solely on the basis that the information was transmitted solely to local law enforcement personnel." Aplt. Opening Br. at 19-20.

"We review de novo whether jury instructions, as a whole, correctly state the law and provide the jury with an understanding of the issues." *United States v. Little*, 829 F.3d 1177, 1181 (10th Cir. 2016). We will reverse "only if we have substantial doubt that the jury was fairly guided." *Id.* (internal quotation marks omitted).

We have no doubt that the trial court's instruction fairly guided the jury under § 1512(a)(1)(C). The Supreme Court has explained that, in a case such as this one, where the defendant kills without

> particular federal law enforcement officers in mind[,] the Government must show a *reasonable likelihood* that, had, *e.g.*, the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer. That is to say, where the defendant kills a person with an intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communications with *federal* law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer.
>
>    . . . [T]he Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical.

*Fowler v. United States*, 563 U.S. 668, 677-78 (2011). The trial court's instruction utilized this very same language.[1] Consequently, the instruction explained the requisite

---

[1]   The jury instruction concluded with *Fowler*'s language:

> [Y]ou must find that the government has proved a reasonable likelihood that had Crystal K. Fisher communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer. That is to say, if you find that the defendant killed Crystal K. Fisher with the intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communications with *federal* law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer.
>
>    To that end, the Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical.

R., Vol. I at 182 (emphasis in original).

7

federal nexus where, as here, "the defendant did not have federal law enforcement officers (or any specific individuals) particularly in mind." *Id.* at 670. We therefore reject Roberson's contention that the jury was able to convict him under § 1512(a)(1)(C) only as to potential communications with local law enforcement officers. *See United States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002) ("We presume jurors attend closely to the language of the instructions in a criminal case and follow the instructions given them.").

## II. *Brady v. Maryland*[2]

Roberson argues the prosecution violated *Brady* by not disclosing Cooper's involvement in a shooting that occurred thirteen years before trial. Apparently, in January 2001, Cooper was in a Riley County, Kansas parking lot observing a drug deal. The buyer and his friends became aggressive when the seller, Anthony Mitchell, decided to "scratch the deal." *Mitchell v. State*, No. 92,223, 2005 WL 1136872, at *1 (Kan. Ct. App. May 13, 2005) (per curiam) (internal quotation marks omitted). After Mitchell was hit with a board, his associate, Private Jeremy Ware, grabbed a gun and either gave it directly to Mitchell, *see id.*, or handed it to Cooper, who then gave it to Mitchell, *see United States v. Ware*, No. 20010923, 2005 WL 6524258, at *1 (A. Ct. Crim. App. Mar. 10, 2005). Mitchell fired at his attackers, killing one and wounding another. *Mitchell*, 2005 WL 1136872, at *1; *Ware*, 2005 WL 6524258, at *1. Mitchell and Ware were prosecuted by State and military authorities, respectively. Cooper was not charged. Roberson asserts these facts show "that one of the government's star witness[es] . . . had

---

[2] 373 U.S. 83 (1963).

been involved in a similar homicide" and "would have provided the defense with substantial evidence to undermine not only Mr. Cooper's testimony, but also the testimony of the other, similarly situated cooperating witnesses." Aplt. Opening Br. at 29.

To establish a *Brady* violation, Roberson must prove that the government suppressed evidence of the shooting that was in its possession or control, that the evidence was favorable to Roberson as exculpatory or impeachment evidence, and that the evidence was material. *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009). Our review is de novo. *See id.* ("While we ordinarily review a district court's denial of a motion for a new trial for an abuse of discretion, when the motion is based on an alleged *Brady* violation, we review the district court's decision de novo." (internal quotation marks omitted)).

Preliminarily, Roberson must show that the evidence of Cooper's involvement in the 2001 shooting was in the possession or control of the government. To meet that burden, Roberson speculates that the law enforcement agencies involved in his case—the Drug Enforcement Agency and the Junction City Police Department—"would have been aware of the relevance of the information related to Mr. Cooper's prior criminal activities" because a Riley County detective assisted in interviewing Fisher. Aplt. Reply Br. at 6. But Roberson does not explain how Fisher's interview, which occurred in 2010, would have revealed any information about Cooper's activities in 2001. Speculation that the government "should or could have learned of" purported *Brady* evidence is insufficient to show the evidence was in the government's possession or control. *See*

9

*United States v. Hoyle*, 751 F.3d 1167, 1172 (10th Cir. 2014) (internal quotation marks omitted).

Further, it is questionable whether the evidence would have been favorable to Roberson at all. The evidence is clearly not exculpatory and it bears no resemblance to Fisher's murder. It is even unclear whether Cooper had any involvement, given that the opinion of the Kansas Court of Appeals does not mention him.

Nevertheless, Roberson suggests that evidence showing Cooper "had also been involved in providing a weapon used in a drug homicide on at least a prior occasion" would have undermined "his inherent attempts to limit his involvement in the instant offense." Aplt. Opening Br. at 28. But Cooper admitted on direct examination that he had procured "a Glock 40" for Webb "weeks" before Crystal Fisher's murder. R., Vol. I at 1315, 1317. Thus, there would have been little impeachment value in showing the jury that Cooper may have procured a gun for someone other than Webb years earlier.[3]

And as to materiality, Roberson has not shown "that the likelihood of [achieving] a different result [through admission of the evidence] is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (alteration and internal quotation marks omitted). Indeed, evidence that only "insignificantly impact[s] the degree of impeachment" will generally not satisfy the materiality standard. *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009). Here,

---

[3] Our discussion presupposes that evidence of the 2001 shooting would have been admissible. We need not resolve this point here, and merely note that the Federal Rules of Evidence generally "do not permit the introduction of evidence regarding collateral matters solely for the purpose of impeaching the credibility of a witness." *United States v. Velarde*, 485 F.3d 553, 561 (10th Cir. 2007).

Cooper was impeached with evidence showing that he had been a drug dealer for twenty years; had been convicted of being a felon in possession of a firearm and was hoping to get a sentence reduction for his testimony; smoked marijuana daily; and had waited several years to tell police he had handled the murder weapon and that Roberson had confessed to him. The evidence of Cooper's involvement in the 2001 shooting—which has only minimal impeachment value, if any—would not have affected the weight of impeachment evidence already offered against him.

Moreover, this is not a close case. The other evidence of Roberson's guilt "is strong enough to sustain confidence in the verdict." *See Cain*, 132 S. Ct. at 630. In particular, both Smith and Shaw testified that Roberson made comments indicating he killed Fisher. Chism and Escobedo testified they picked up a nervous and out-of-breath Roberson near the murder scene and drove him away until he asked them to dispose of an item in a lake. And the murder weapon was ultimately found in a pond behind the Wal-Mart that Roberson visited after the murder.

Roberson's *Brady* claim lacks merit.

### III. Sufficiency of the Evidence

Roberson argues insufficient evidence supports his § 1512(a)(1)(C) murder conviction and his drug-conspiracy convictions. "We review sufficiency of the evidence claims de novo" to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Faust*, 795 F.3d 1243, 1247-48 (10th Cir. 2015) (internal quotation marks omitted).

In regard to the murder conviction, Roberson appears to contend there is insufficient evidence he was the murderer. We disagree. In addition to the evidence cited above in rejecting Roberson's *Brady* claim, we note Cooper's testimony that on the night of Fisher's murder, Webb said that Roberson had killed her. Cooper further testified that several days after the murder, Roberson admitted he killed her. Consequently, the jury's finding that Roberson killed Fisher is well "within the bounds of reason." *United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir. 2007) (internal quotation marks omitted).

As for the drug-conspiracy convictions, Roberson argues the evidence shows that he was merely "a small level drug distributor," selling only "a few grams of crack cocaine" with no involvement in Webb's organization. Aplt. Opening Br. at 35-36. Roberson's argument is contradicted by overwhelming evidence of significant involvement in Webb's organization. The evidence showed that Roberson not only distributed large amounts of powder and crack cocaine for the organization, he acquired powder cocaine and was involved in converting it to crack cocaine for distribution by other members. Further, he exercised authority over other members of the organization and he murdered Fisher to protect the organization.

Substantial evidence supports Roberson's murder and drug-conspiracy convictions.

IV.  Sentencing

Roberson argues that his prior felony drug convictions could not be used to support a mandatory life sentence because the finality of those convictions was not

presented to the jury and proven beyond a reasonable doubt.  This court has repeatedly stressed, however, that "the 'fact' of a prior conviction may be found by a sentencing judge rather than a jury."  *United States v. Prince*, 647 F.3d 1257, 1271 (10th Cir. 2011).  Roberson concedes his argument is foreclosed by circuit precedent, but he raises it "to preserve the argument for review to the Supreme Court and/or to take advantage of a favorable ruling from the Supreme Court."  Aplt. Opening Br. at 32.  Accordingly, we reject his argument.

## CONCLUSION

We affirm Roberson's convictions and sentence.

Entered for the Court


Jerome A. Holmes
Circuit Judge